Mrs. Mildred **RITTENBERG**, wife of and Bernard **WOHL**, Appellants,

v.

**UNITED STATES of America,**
Appellee.

No. 17673.

United States Court of Appeals
Fifth Circuit.

June 16, 1959.

Rehearing Denied Aug. 14, 1959.

Robert Weinstein, Sylvan J. Steinberg, John A. Shanks (of Rittenberg, Weinstein & Bronfin), New Orleans, La., for appellants.

Carter, Bledsoe, Atty., Dept. of Justice, Washington, D. C., Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson, Atty., Washington, D. C., Norman Prendergast, Asst. U. S. Atty., M. Hepburn Many, U. S. Atty., Prim B. Smith, Jr., Asst. U. S. Atty., New Orleans, La., for appellee.

Before HUTCHESON, Chief Judge, and BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The question here, as in so many tax cases, is whether the expenditures by Taxpayer were deductible either as a Section 23(a) (1) (A) "ordinary and necessary" business expense or a Section 23 (a) (2) "ordinary and necessary" non-business expense paid for the production or collection of income. Internal Revenue Code 1939, Section 23, 26 U.S.C.A.

The expenditure for the three tax years involved was in reality a payment of a part of the ground rental to owners of the land on which Taxpayer's wholly owned corporation, Wohl, Inc., had built a modern multi-story apartment building, the Wohl Apartments with the aid of an FHA guaranteed mortgage loan of $2,300,000.

In 1949 Taxpayer commenced negotiations with the Federal Housing Administration for a commitment to insure a 35-year loan. FHA required that a corporation be formed to be the builder, owner, operator and mortgagor of the building. The corporation was formed at a nominal capitalization of $1,000. Neither Taxpayer nor his corporation owned or were to own the land on which the building was to be built. This valuable site on St. Charles Avenue in New Orleans was to be leased under a 99-year lease. The landowners insisted upon a $12,000 rental per year for the first 35 years with renegotiation thereafter. Under FHA regulations which prohibited ground rental in excess of a stated percentage of the appraised value, the maximum rental was $9,000 per year. The landowners insisted upon $12,000 rental per year. FHA was unswerving in its ceiling of $9,000 per year.

With the acquiescence if not tacit approval of FHA. Taxpayer entered into a separate contract with the landowners in which he promised individually to pay $3,000 per year for 35 years out of his own funds in return for the landowners' agreement to lease the land to the corporation, Wohl, Inc., for 99 years at $9,000 per year for the first 35 years.

The landowners signed the lease with Wohl, Inc., the loan insurance was approved by FHA, and the building was constructed. Pursuant to this personal agreement, Taxpayer paid the landowners $2,250 in 1951, $3,000 in 1952, and $3,000 in 1953. He deducted these sums from his personal gross income as

ordinary and necessary business expenses.

In addition to being the sole stockholder of Wohl, Inc., Taxpayer has been the active manager of the apartment since its completion in 1951. As manager, he earned and received a salary of $13,500 in 1951, $15,000 in 1952 and $13,500 in 1953. Taxpayer received no dividends on the Wohl, Inc. stock. During the same period Taxpayer was also manager of another apartment building owned by Orleans Park, Inc. in which he was a stockholder. This corporation paid him approximately the same salary for management as did Wohl, Inc.

■ The Commissioner disallowed these deductions on the theory that they were properly the business expenses of Wohl, Inc., the corporation, and not those of Taxpayer, and that they should be treated as capital contributions to the corporation. The District Court after a nonjury trial which included some oral testimony concerning the circumstances and purpose of the supplemental agreement to pay rent as well as many documents, likewise held against Taxpayer. We agree.

Taxpayer's theory is that his regular trade and business was that of the management of apartments. Therefore, he insists, the agreement to make the supplemental rental payments with the landowners was to enable him to get a contract which would pay him a substantial salary as manager of the apartment when and as built. He does not claim that he was in the regular business of paying rentals for properties owned either by his own corporations or by other corporations. And he vehemently disavows the purpose attributed to him by the Commissioner of claiming as a personal deduction the expense of the separate corporate entity.[1] The corporation's obligation for rental was $9,000. It paid

that. Under mandatory prohibitions of FHA it could pay no more. The payment of the $3,000 was Taxpayer's debt and his alone.

What Taxpayer does not contend is significant. For it highlights the necessity of his demonstrating that this annual payment was (a) an expense of the personal service business of apartment management, and as such was (b) necessary and (c) ordinary.

On factor (a), the business of apartment management, we can assume, as does the Government, that this was his trade. Such an assumption, however, does not discard the remainder of the uncontradicted testimony showing that he was, in his own words, engaged "exclusively in *building* and managing apartments," which means investment in the ownership of apartments or of stock of corporations owning them. And while explaining that he made the personal supplemental agreement to pay $3,000 a year since this was "the only way that I could have established this business and kept myself employed and made a livelihood * * *," he reflects categorically another major purpose. "This was my investment, personally, to build this building. Without such an added investment I could not have built this building on this particular piece of ground."

■ Factors (b) and (c)—ordinary and necessary—unavoidably justify the conclusion that "despite the multitude of decisions involving interpretations of that term, each case must still be determined on the basis of its peculiar facts and circumstances." 4 Mertens, Law of Federal Income Taxation, § 25.09 at 19 (1954). And in this case by case search, we are reminded that the decisive distinctions are those of degree and not of kind. To this the Supreme Court added, there is no "verbal formula that will supply a ready touchstone" since the

---

1. The claim for refund filed administratively prior to suit was rejected with the following statement by the Commissioner's representative. "These claims have been given consideration and are recommended for rejection as *taxpayer can-* *not claim as a personal deduction the* *expense of a separate entity.* Therefore, they are disallowed as not being 'ordinary and necessary' expenses under the provisions of the Internal Revenue Code * * *." (Emphasis supplied.)

statutory standard "is not a rule of law; it is rather a way of life. Life in all its fullness must supply the answer to the riddle." Welch v. Helvering, 1933, 290 U.S. 111, 115, 54 S.Ct. 8, 9, 78 L. Ed. 212.

Little would be served in trying to re-catalogue the inner and outer reaches of necessary and ordinary, or to delineate those factors whose presence or absence leads to one rather than the other conclusion. See Deputy v. Du Pont, 1940, 308 U.S. 488, 60 S.Ct. 363, 84 L.Ed. 416; Welch v. Helvering, supra; and 4 Mertens, supra, §§ 25.05–25.09. Few, if any, may be considered as decisive. It is sufficient, we think, briefly to indicate some facets of this record which support the conclusion both of fact and law of the District Court that these supplemental rental payments were not ordinary and necessary expenditures made in the course of the personal service business of managing apartments.

There is, first, nothing in the record to compel the factual-legal conclusion that the payment was made, as Taxpayer now claims, to get him a lucrative job as manager of his own apartment even if that is assumed to be sufficient. This might have been one of his purposes but the Trial Court was entitled to think, as he presumably did, that this was far overshadowed both in purpose and necessity by other factors. The prospective job as apartment manager was quite remote in the chain of consequences. There were a number of steps before that employment came into fruition and as to each of them the personal agreement to pay the supplemental rent was an essential prerequisite. Without the land the apartment could not be built. Without the lease the land could not be acquired. Without the loan the apartment could not be built. Without the FHA commitment the loan could not be obtained. Without the reduction of rental payable by the corporation to $9,000 the commitment could not be secured. Without the personal agreement to supplement the rent by $3,000 none could be obtained. Conversely, by paying the $3,000 Taxpayer got much more than prospective employment. He would become the beneficial owner of an apartment costing in the neighborhood of $2,300,000 which would be paid out in the 35-year term of the mortgage which coincided with the term of the supplemental agreement.

Looking at it from these directions, the expenditure cannot be described as predominantly for the purpose of expanding employment in a current occupation. The use of a corporation to build, own and operate the apartment was a requirement of the FHA. The salary could continue only so long as the operation produced enough revenues over and above amortization of the debt and the cost of operations excluding the owner-manager's salary. If operations did supply such revenues with which to pay the manager's salary, the corporate owner (and hence Taxpayer's) equity in the building was automatically increasing.

From this same vantage point what is paid hardly seems to have been ordinary as that term is used, not in its ordinary sense, but in the extraordinary sense of this ordinary expense tax exemption. Granted, as one authority puts it, that the test of what is ordinary may be that of the "hard-headed businessman," 4 Mertens, supra, § 25.09 at 25, which allows the deduction if "the average hard-headed businessman" might have made the expenditure, although its payment seems unusual or unique or doubtful to one not having the responsibilities of management, we do not think this payment meets even this flexible standard.

There was no proof that persons engaged professionally in the personal service business of apartment management make payments of the kind or amount even remotely resembling this supplemental rent. The obligation to pay the supplement ran for 35 years. It was in no way related to continuation of Taxpayer in the management, or the possibility that, in this world of vicissitudes, accidents, epidemics and disabling diseases, Taxpayer might not, at some unknown time, become unable to perform

this work. Indeed, so far as this record goes, there was not even assurance that a management contract would continue for the life of the supplemental payment, the life of the Taxpayer, or the life of the mortgage. So long as things went well, presumably Taxpayer could control his corporation to secure continuation of the employment. But if things went bad, or revenues were inadequate or default was actual or imminent so that outsiders might have a legal ground for interest in the internal affairs of the corporation, the corporation was not bound to Taxpayer under any long-term employment contract.

That this payment cannot readily be pegged in any traditional category is of no consequence. "If this results in making the item a nondescript before the law or puts in a vacuum abhorrent to the accountant, so it must stand." Connally Realty Co., 31 B.T.A. 349, 350, affirmed 5 Cir., 1936, 81 F.2d 221. It is rental to the landowner at least and hence an operating expense of a kind which the corporation would ordinarily pay and which all, save the FHA, desired the corporation to pay. It was a capital expenditure in the sense that it was an indispensable payment for Taxpayer either to get ownership of an expanding equity in a valuable building, to get the building at all, or a chance to work. From the corporation's viewpoint it was, in a sense, as though Taxpayer had delivered to the corporation an undivided one-fourth leasehold (annual rental $12,000 of which $3,000 was to be paid by him). Its hybrid character is but one of the unique consequences which occur in this complex life as tax law, the Commissioner of Internal Revenue, the FHA and its administrative practices, the separate entity of the wholly owned corporation of nominal capitalization and the Taxpayer all converge in this apartment building enterprise.

We do not think that United States v. E. L. Bruce Co., 6 Cir., 1951, 180 F.2d 846; Charles J. Dinardo, 1954, 22 T.C. 430; Dunn & McCarthy, Inc. v. Commissioner, 2 Cir., 1943, 139 F.2d 242, so heavily pressed by Taxpayer require a different result. These expenditures were not, as were those, for the protection of an existing investment or the continuance of an existing business, or the preservation of existing income from loss or diminution. Here it was to acquire an investment, to obtain a new job, to secure new income that caused the personal agreement to be made.

For like reasons, the effort to come under Section 23(a) (2) as a nonbusiness expense is equally unsuccessful.

Affirmed.